******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JOHN BREWER *v.* COMMISSIONER
OF CORRECTION
(AC 40984)

Alvord, Sheldon and Eveleigh, Js.*

*Syllabus*

The petitioner, who had been convicted of the crimes of murder and criminal
   possession of a firearm, filed a second petition for a writ of habeas
   corpus, claiming that he received ineffective assistance from B, the
   counsel who represented him with respect to his first habeas petition.
   The habeas court rendered judgment dismissing three counts of the
   second habeas petition and denying the petition as to the remaining
   count. On appeal, this court concluded that the habeas court improperly
   dismissed the claim of ineffective assistance of B in the second habeas
   petition and remanded the matter for further proceedings. While the
   appeal in the second habeas matter was pending, the petitioner filed a
   third petition for a writ of habeas corpus, claiming that his second habeas
   counsel rendered ineffective assistance. The third habeas petition and
   the matter on remand concerning the second habeas petition were con-
   solidated. Following a trial, the habeas court rejected the petitioner's
   claim that B was ineffective in failing to claim that his trial counsel
   rendered ineffective assistance by failing to consult with a certain expert
   and to object to the admission of certain prior inconsistent statements.
   From the judgment rendered thereon, the petitioner, on the granting of
   certification, appealed to this court. *Held*:
1. The habeas court properly concluded that B did not render ineffective
   assistance in failing to claim in the petitioner's first habeas action that
   trial counsel rendered ineffective assistance by not consulting a forensic
   pathologist to reconstruct the crime scene to discredit certain eyewit-
   ness testimony; trial counsel investigated the possibility of a crime scene
   reconstruction by consulting with D, an expert criminalist, who told
   trial counsel that he could not perform such a reconstruction due to
   the nature of the evidence available, trial counsel was entitled to rely
   on D's representation that the crime scene could not be reconstructed
   and was not required to search for another expert to perform a recon-
   struction, and because the testimony of the state's medical examiner
   at the petitioner's criminal trial was consistent with the testimony of
   the forensic pathologist that the petitioner presented at his habeas trial,
   the jury had before it the same evidence that presumably would have
   been revealed by an expert forensic pathologist.
2. The habeas court properly determined that B was not ineffective in failing
   to claim in the petitioner's first habeas corpus action that trial counsel
   was ineffective in failing to object to the admission of certain prior
   inconsistent statements from two witnesses; both trial counsel and B
   testified at the habeas trial that it was not necessary to object to the
   admission of evidence simply for the sake of objecting and that the
   evidence at issue must be viewed within the context of the entire case,
   trial counsel also testified that he did not object to the admission of
   the statements at issue because he considered the admission of them
   beneficial to the petitioner in that they highlighted the lack of credibility
   of the two witnesses, and the habeas court properly determined that
   trial counsel's decision not to object to their admission was a reasonable
   strategic decision based on his assessment that the statements were
   beneficial to the petitioner.

Argued January 8—officially released April 30, 2019

*Procedural History*

Amended petition for a writ of habeas corpus,
brought to the Superior Court in the judicial district
of Tolland, where the court, *Kwak, J.*, dismissed the
petition in part; thereafter, the remaining count of the
petition was tried to the court; judgment denying the

petition; subsequently, the court denied the petition for certification to appeal, and the petitioner appealed to this court, which affirmed in part, reversed in part, and remanded the matter for further proceedings; thereafter, the court, *Sferrazza, J.*, granted the petitioner's motion to consolidate; subsequently, the matter was tried to the court, *Hon. John F. Mulcahy, Jr.*, judge trial referee; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Daniel Fernandes Lage*, assigned counsel, for the appellant (petitioner).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Eva Lenczewski*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

SHELDON, J. Following the granting of his petition for certification to appeal, the petitioner, John Brewer, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus alleging ineffective assistance by his prior habeas counsel. On appeal, the petitioner claims that the habeas court erred in rejecting his claim that his prior habeas attorney rendered ineffective assistance by failing to allege that his criminal trial counsel rendered ineffective assistance by failing (1) to consult with a forensic pathologist to reconstruct the crime scene, and (2) to object to the admission into evidence of certain witness statements. We affirm the judgment of the habeas court.

The petitioner was convicted, following a jury trial, of murder in violation of General Statutes § 53a-54a (a) and criminal possession of a firearm in violation of General Statutes (Rev. to 2001) § 53a-217, upon which he ultimately was sentenced to a total effective sentence of sixty years incarceration. His conviction was later affirmed by our Supreme Court on direct appeal. See *State* v. *Brewer*, 283 Conn. 352, 927 A.2d 825 (2007).

The Supreme Court set forth the following facts that reasonably could have been found by the jury. "In the early morning hours of December 29, 2001, the victim, Damian Ellis, was with his friends, Damian Wade and Arthur Hall, at the Athenian Diner in Waterbury (diner). The [petitioner] also was present at the diner with a group of friends that included Jason Greene, his brother, Michael Greene, and Gregory Hunter. The victim's group had a verbal altercation with the [petitioner] and Hunter that prompted the restaurant manager to eject both groups of men from the diner. The two groups engaged in some additional verbal sparring and then separated once outside the diner.

"The [petitioner's] group entered a black Lexus sport utility vehicle, driven by Hunter, and was exiting the diner parking lot when Hunter stopped the car in front of the victim, who was standing outside the entrance to the diner. Either Hunter or the victim reinitiated the dispute, and Hunter subsequently exited the vehicle and approached the victim's group with a knife in his hand. The victim backed away from Hunter, down a ramp on the side of the diner, as the [petitioner] exited the vehicle and moved to the corner of the building near the ramp. The [petitioner] walked up to the victim and shot him twice with a nine millimeter Cobray M-11 semiautomatic pistol. One shot entered the victim's brain and likely killed him within five seconds.

"Following the shooting, the [petitioner] got back into the Lexus, which was now driven by Jason Greene, and the two men left the scene. The [petitioner] threw the gun out of the car's window and shortly thereafter exited the vehicle. Jason Greene later directed the

police to the area in which the [petitioner] had discarded the murder weapon." Id., 353–54.

Following his conviction, the petitioner filed his first habeas corpus petition in 2006, in which he was represented by Attorney Walter Bansley III, alleging ineffective assistance of his trial counsel, Attorney John Cizik. The habeas court, *Fuger, J.*, denied his petition and his subsequent petition for certification to appeal. This court dismissed his appeal from the judgment of the habeas court. *Brewer* v. *Commissioner of Correction*, 133 Conn. App. 904, 34 A.3d 480, cert. denied, 304 Conn. 910, 39 A.3d 1121 (2012).

The petitioner filed a second habeas corpus action in April, 2010. His amended petition in that action, filed on June 5, 2013, contained four counts, three of which were dismissed by the second habeas court, *Kwak, J.* The second habeas court denied the petition as to the one remaining count claiming ineffective assistance of appellate counsel on direct appeal. The petitioner appealed from the denial of the petition for certification to appeal, and this court dismissed in part and reversed in part the judgment of the second habeas court. *Brewer* v. *Commissioner of Correction*, 162 Conn. App. 8, 22–23, 130 A.3d 882 (2015). This court dismissed the appeal as to the petitioner's claims of ineffective assistance of trial counsel and prosecutorial impropriety, but concluded that the dismissal of his claim of ineffective assistance of prior habeas counsel was improper and, therefore, remanded that claim to the habeas court for further proceedings in accordance with law. Id. The petitioner did not challenge the denial of his claim of ineffective assistance of appellate counsel.

While the appeal from the second habeas court's judgment was pending, the petitioner filed a third habeas corpus petition alleging that his second habeas counsel, Attorney Vicki Hutchinson, rendered ineffective assistance. The third habeas corpus petition and the present matter, on remand from this court, were ordered consolidated by the court, *Sferrazza, J.*, upon motion of the petitioner's current habeas counsel.

On September 5, 2017, following a trial, the habeas court, *Hon. John F. Mulcahy, Jr.*, judge trial referee, filed a memorandum of decision rejecting the petitioner's claims that his first habeas counsel, Bansley, was ineffective in failing to claim in his first habeas action, that his criminal trial counsel, Cizik, rendered ineffective assistance by failing to consult with a forensic pathologist to reconstruct the crime scene, and failing to object to the admission of prior inconsistent statements by Jason Greene and Michael Greene. The court subsequently granted the petitioner's petition for certification to appeal and this appeal followed.

"The use of a habeas petition to raise an ineffective assistance of habeas counsel claim, commonly referred

to as a habeas on a habeas, was approved by our Supreme Court in *Lozada* v. *Warden*, 223 Conn. 834, 613 A.2d 818 (1992). In *Lozada*, the court determined that the statutory right to habeas counsel for indigent petitioners provided in General Statutes § 51-296 (a) includes an implied requirement that such counsel be effective, and it held that the appropriate vehicle to challenge the effectiveness of habeas counsel is through a habeas petition. . . . In *Lozada*, the court explained that [t]o succeed in his bid for a writ of habeas corpus, the petitioner must prove both (1) that his appointed habeas counsel was ineffective, and (2) that his trial counsel was ineffective. [Id.,] 842. As to each of those inquiries, the petitioner is required to satisfy the familiar two-pronged test set forth in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. First, the [petitioner] must show that counsel's performance was deficient. . . . Second, the [petitioner] must show that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . *Lozada* v. *Warden*, supra, 842–43. In other words, a petitioner claiming ineffective assistance of habeas counsel on the basis of ineffective assistance of trial counsel must essentially satisfy *Strickland* twice . . . .

"In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . Judicial scrutiny of counsel's performance must be highly deferential and courts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. . . . With respect to the prejudice prong, the petitioner must establish that if he had received effective representation by habeas counsel, there is a reasonable probability that the habeas court would have found that he was entitled to reversal of the conviction and a new trial . . . .

"It is well settled that in reviewing the denial of a habeas petition alleging the ineffective assistance of counsel, [t]his court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of coun-

sel is plenary." (Internal quotation marks omitted.) *Adkins* v. *Commissioner of Correction*, 185 Conn. App. 139, 150–52, 196 A.3d 1149, cert. denied, 330 Conn. 946, 196 A.3d 326 (2018).

I

The petitioner first claims on appeal that the habeas court erred in concluding that Bansley did not render ineffective assistance by failing to allege in his first habeas action that Cizik's representation of him was ineffective because he failed to consult with a forensic pathologist to reconstruct the crime scene to discredit the state's case—more specifically, the eyewitness testimony of Gregory Hunter. We disagree.

In addressing this claim, the habeas court set forth the following summation of the evidence adduced at the petitioner's criminal trial. "Evidence presented indicated the shooting occurred on a down slanted ramp off (and to the side of) the stairs leading to and from the doorway of the diner. Hunter acknowledged that the argument inside the diner escalated to the point that his group (Hunter, [the] petitioner, and the two Greenes) and the victim's group (Ellis, AJ, and Damien Wade) were asked by the management to leave—'take it outside.' In his statement to the police, Hunter described the circumstances of the shooting, as follows: 'Once outside the argument got worse and we were yelling at each other. [Ellis] was yelling to me that me and my cousins were all snitches and I was yelling back at him that he was the snitch. We yelled at each other to go meet up at the hill to fight. Then me, the Greenes and [the petitioner] walked to the Lexus and got in and wanted to drive out to go up to Long Hill to fight [Ellis]. I was driving. We were driving up the driveway toward the street and near the entrance on the ramp area I saw [Ellis] and he was yelling at me . . . I got pissed so I stopped the Lexus by the ramp and got out. I walked up the stairs toward [Ellis]. We were face to face on the ramp and . . . [Ellis] was walking backwards down the ramp and I was walking towards him. I had a folding knife out and I was holding it while walking at him. Mike Greene and some other people were trying to hold me back and telling me to chill. I saw [the petitioner] get out of the passenger side of the Lexus walking toward the corner side of the diner and he was holding his gun. [The petitioner's] gun was on a strap that was on his shoulder. Me and [Ellis] were still yelling at each other and we were near the corner of the diner. I could see [the petitioner] walk up to [Ellis] and [the petitioner] shot him in the right side of the head and [Ellis] spun around and started falling backward and [the petitioner] shot him again in the chest. I saw [the petitioner] run back into the Lexus and Jason [Greene] drove off. Me and Mike went across the street to the gas station and Mike saw some guy he knew and asked him for a ride and he gave us a ride to mother's house.

Yesterday morning, [December 29, 2001], when the police came to talk to me I turned over to them the knife I had when I was arguing with [Ellis].'

"Hunter's trial testimony was substantially consistent with his statement to the police. Prior to his testimony, the medical examiner, Dr. Arkady Katsnelson, had testified and the postmortem report was put in evidence; as would be expected, given an obvious concern stemming from frontal entry wounds and right to left trajectories, Hunter was examined closely and extensively by both counsel concerning the positioning of himself and the petitioner at the time of the shooting. He testified on direct: By the time I pulled out my knife, the petitioner 'came from behind him [the victim] and shot him.' Hunter testified the victim was facing him. 'He [the petitioner] came . . . kind of like towards around from his back, like the right side of him.' When asked where he was standing when he heard the gunshots, he answered, 'on the ramp . . . with Ellis . . . looking toward' me. Hunter also stated he could see the gun in the petitioner's hand, a distinctive gun that he had seen the petitioner with earlier that evening.

"On cross, Hunter said that at the time of the first shot, the gun was not pressed up against the side of the victim's head; he estimated that the gun was 'about two or three feet away from [the victim] when first fired. When asked from which side of [the victim] the gun came into view, Hunter answered, '[l]ike towards . . . the back left side of him [the victim].' On redirect, Hunter testified that at the time the shot was fired, the petitioner would have been behind [the victim] to the left. On further examination, Hunter stated that the first shot hit [the victim] in the head, [the victim] spun around, 'almost right in front of [the petitioner], but at that time, Mike Greene was . . . pulling me away and all I seen . . . was the back of . . . [the victim]' when I (Hunter) heard the second shot. Hunter was asked 'as you sit here now, is there any doubt in your mind that [the petitioner] was the one who held the gun and pulled the trigger that fired the shots into [the victim]?' The response was, 'No.'

"Dr. Katsnelson testified that the bullet to the head penetrated the victim's skull from right to left and exited from the rear of the head; the bullet tract is front to back, right to left, and slightly downward. . . . He testified that it is his opinion that there was only one shooter because the gunshot wounds are the same, right to left, and front to back, and the general direction of each bullet track is the same. He believes the two shots were fired within a short period of time because they are basically 'in the same directions to the head and to the chest cavity;' he cannot be more specific about the length of time between the two shots, but 'I can tell because the shots are in the same general directions . . . I believe there was an extremely short interval

between the shots.' Dr. Katsnelson testified that the entry wound to the head was not a contact wound; the muzzle of the gun was not pressed against the victim's head. He believed the shooter was in front of the victim and 'the victim's right side was exposed to the gun.' Because there was evidence of gun powder stippling on the skin of the head, he believes the victim was shot from a distance of approximately, not exactly, up to six feet—'[i]n my opinion, it's approximately in the range of six feet.'. . .

"Dr. Katsnelson said he thought the shot to the head came from the front, but the shooter could have been on the side of the victim; it could have been from the side, from the front, but not from the back. And, the victim's head could have been turned to the side; '[d]epends on the position of the head in this time when he was shot.' Dr. Katsnelson testified: 'I don't believe that somebody will see a gun [and] not try to turn the head or to move somewhere and he was even in the front of the shooter, probably the victim was trying to somehow instinctively . . . turn his head and received the bullet in the right side.' " (Footnotes omitted.)

At his habeas trial, the petitioner offered the testimony of Dr. Mark Taff, an expert in forensic pathology and crime scene reconstruction, to contradict Hunter's testimony that the petitioner had approached the victim from his rear left side before shooting him in the right side of the head. Taff testified, inter alia: "The bullet passed through the [victim's] head from a right to left direction. The bullet in the chest went from right to left. So, the person who is shooting the victim, assuming it's a freeze-frame position, is going to be most likely somewhere in front of the victim, somewhere to the victim's right." Taff expressed the view that the position of the shooter in front of the victim, slightly to the right, was essentially beyond dispute absent a person, or persons, of extraordinary dexterity.

The habeas court also heard testimony from Cizik, who testified that he considered the possibility of a crime scene reconstruction and, to that end, he consulted with Dr. Peter DeForest, who is a criminalist. At Cizik's request, DeForest examined all of the evidence, read all of the reports and looked at all of the photos in this case. DeForest told Cizik that he was unable to do a reconstruction of the crime scene because there was insufficient physical evidence in the case, and there were too many variables in the evidence that did exist, to do so. For example, the crime scene had not been immediately secured, so there no way to be certain if the shell casings were where they would have been when ejected from the gun, and there was no way to determine where or how the victim fell. DeForest did, however, counsel Cizik on some of the areas to cross-examine the medical examiner, as well as the police officers who processed the evidence at the crime scene.

Cizik testified that he did not think it was necessary to consult a forensic pathologist because DeForest advised him fully.

Bansley also testified at the petitioner's habeas trial. Bansley recalled reviewing the trial transcripts in this case and noticing inconsistencies between Hunter's testimony and the physical evidence as interpreted by Katsnelson. He testified that because of those inconsistencies, he conferred with a forensic pathologist, a doctor who he had used in other cases, and who was a former medical examiner in Connecticut. After reviewing the crime scene reports, the pathologist told Bansley that he could not be of any help because there were problems with the crime scene, specifically, as Bansley stated, "things being moved around." Based upon that response, Bansley did not pursue the claim further. Bansley also emphasized that such a claim was immaterial because the petitioner claimed that he was not present when the victim was shot and had proceeded to trial with an alibi defense.

On the basis of the foregoing testimony, and its review of the trial court record, the habeas court rejected the petitioner's claim that Cizik was ineffective in not consulting a forensic pathologist. The court held: "This court has the highest respect for both experts; both Dr. Katsnelson and Dr. Taff have impeccable credentials and years of experience in the field of forensic pathology. Each, according to the evidence, has performed thousands of autopsies. It certainly appears that Dr. Taff agreed with the medical examiner as to the likelihood of movement of victim and shooter while the murder unfolded; as his report states: 'Just the sight of a gun pointed at a human target is enough to trigger a rapid, behavioral response in both the victim . . . and the shooter . . . which would change the spatial relationship between the actors.' It is the court's view that what took place on that ramp did not occur in particularly slow motion, or in any sort of a 'freeze-frame' manner. It is also the court's view that in the factual commission of the actual shooting, there are, necessarily, many variables regarding positioning.

"Dr. Taff postulated that an easy manner in which to reconstruct a shooting was to compare the victim to the sun at the center of the universe with the planets (shooters) orbiting around the victim. He testified that such [a] 'dynamic helps to understand all possible spatial relationships, distances, angles, heights, and movement of the individuals involved.' However, Dr. Taff observed that 'in contrast to solid planetary masses, human beings have articulated joints which are flexible and able to bend/change positions and alter body lengths.' Here, both bullets passed through the victim front to back and right to left; therefore, Dr. Taff testified, 'the person who is shooting the victim, *assuming it's freeze-frame position*, is going to be *most likely*

somewhere in front of the victim, and somewhere to the victim's right.' . . .

"Seemingly predicated on an assumption of substantial immobility of shooter and victim, a courtroom demonstration with the doctor as the victim and counsel as the shooter was presented. This claimed demonstrative aid consisted of various scenarios, around four quadrants; in each, either party, the victim or the shooter, was presented as, or presumed to be, stationary. Such, in the court's view, was not particularly realistic considering the entire evidence, including Hunter's statement, his testimony, and the statements and testimony of others. The totality of the evidence does not readily lend itself to a brief series of still frames.

"It is clear from the evidence that when Hunter jumped out of the Lexus, tempers were flaring; he was armed with a knife and walking at [the victim], with the latter moving backward down the ramp toward the corner of the building. The victim was being pursued by an enraged Hunter, armed with a knife, and, whether known or unknown, someone approaching him from behind with a gun. At the same time, Damian Wade was between the victim and Hunter trying to keep the two apart; also, at the same time, Michael Greene was grabbing Hunter attempting to hold him back. The evidence indicates, indeed, much movement; as the respondent [the Commissioner of Correction] argues, even a minor bend, twist, crouch, or a slight turn could have significant impact on any opinion as to the precise position of the shooter or the victim when the first shot was fired. Thus, there exist innumerable imponderables. Such, in the court's view, offers reasonable confirmation to what Dr. DeForest related to trial counsel and to what habeas counsel's forensic pathologist opined: there was not enough physical evidence to do a meaningful reconstruction.

"What Dr. Taff's report and testimony do is highlight the obvious inconsistency between Dr. Katsnelson's findings and an isolated portion of Hunter's statement (and testimony) describing the actual shooting. But, that inconsistency was apparent from the very beginning and was addressed through examination of witnesses at trial, trial counsels' summations, and postverdict discussions by first habeas counsel with a forensic pathologist. At the criminal trial, the petitioner's counsel cross-examined Hunter on his version of the shooting and made reference to the inconsistent evidence in summation. The state certainly acknowledged the importance of the issue when, toward the end of its summation, it referred to 'the physics of this, how it all happens,' and offered a somewhat plausible explanation. . . . Thus, the issue was neither overlooked nor ignored by counsel. As Attorney Bansley put it, an expert was not needed to know that there was a discrepancy between the Katsnelson findings and

part of the Hunter account of the incident.

"From the inception of his representation of the petitioner, and throughout the case, trial counsel, Attorney Cizik, consulted and conferred with his expert, Dr. DeForest, who advised that a crime scene reconstruction was not feasible given the many variables and the dearth of physical evidence. Dr. DeForest remained on in a consulting capacity aiding trial counsel, through his experience and expertise, in the preparation of the case and the cross-examination of witnesses. Neither the evidence nor the record supports any finding of deficient performance on the part of trial counsel in not retaining the services of, or otherwise consulting with, a forensic pathologist relative to the anatomical positioning of shooter and victim.

"Furthermore, the petitioner's defense in the criminal case, from the very beginning, was grounded on an alibi, as is apparent from the credible testimony of trial and prior habeas counsel before this court, the petitioner's testimony before the jury, the petitioner's testimony [in his previous habeas trial], and the presentation of the petitioner's alibi witness at the criminal trial, David Whitney. It would seem that positioning evidence related to shooter and victim—who was standing where when the gun was fired—is of somewhat questionable materiality, even for impeachment purposes, when the petitioner claims he was not even there. . . .

"Based upon the foregoing, the court concludes that the petitioner has failed to show that Attorneys Cizik and Bansley rendered deficient representation in the criminal trial and the first habeas. Even if the court were to assume deficient performance has been proven, which it has not, the petitioner has not proven that he was prejudiced by such deficient performance by undermining this court's confidence in the outcome of the criminal trial." (Emphasis added; footnotes omitted.)

On appeal, the petitioner claims that Bansley should have claimed, in his first habeas action, that Cizik's representation of him was ineffective because he should have consulted a forensic pathologist to reconstruct the crime scene to undermine Hunter's testimony. We disagree.

"As this court previously has observed, [a] trial attorney is entitled to rely reasonably on the opinion of an expert witness . . . and is not required to continue searching for a different expert. . . . Moreover, it is well established that when a criminal defense attorney consults with an expert in a relevant field who thereafter apprises counsel that he or she cannot provide favorable testimony, counsel is entitled to rely reasonably on [that] opinion . . . and [is] not required to continue searching for a different expert. . . . [T]he selection of an expert witness is a paradigmatic exam-

ple of the type of strategic choic[e] that, when made after thorough investigation of [the] law and facts, is virtually unchallengeable." (Citations omitted; internal quotation marks omitted.) *Nicholson* v. *Commissioner of Correction*, 186 Conn. App. 398, 413–14, 199 A.3d 573 (2018), cert. denied, 330 Conn. 961, 199 A.3d 19 (2019).

Here, Cizik investigated the possibility of a crime scene reconstruction by consulting with DeForest, an expert criminalist. DeForest told Cizik that he could not perform such a reconstruction due to the nature of the evidence available. Cizik was entitled to rely on DeForest's representation that the crime scene could not be reconstructed, and was not required to search for another expert to perform a reconstruction. Moreover, the testimony of the state's medical examiner, Katsnelson, was consistent with Taff's testimony, so the jury had before it the same evidence that presumably would have been revealed by a forensic pathologist such as Taff. We thus conclude that the habeas court properly concluded that Bansley did not render ineffective assistance in failing to claim in the petitioner's first habeas action that Cizik rendered ineffective assistance to the petitioner in not consulting a forensic pathologist.

## II

The petitioner also claims that the habeas court erred in rejecting his claim that Bansley rendered ineffective assistance by failing to claim in the petitioner's first habeas action that Cizik was ineffective by failing to object at trial to the admission, as substantive evidence, of prior inconsistent statements of Jason Greene and Michael Greene. We disagree.

The habeas court set forth the following facts in its discussion of this claim. "Jason Greene gave two statements to Waterbury Police Detective Kennelly on December 29, 2001, within hours of the murder. The statements are inconsistent in a number of respects. The most glaring inconsistency concern[ed] his first statement reciting he saw the petitioner jump out of the Lexus and 'walk up to [the victim] point a gun at him and shoot him twice.' In the second statement he changes his recollection of the shooting as follows: '[W]e all walked back to the Lexus . . . Greg was driving . . . [the victim] was standing in the middle of the walkway and yelled something at us . . . Greg got out along with Michael and [the petitioner] . . . I watched Greg walked up the front stairs and down the walkway . . . [the petitioner] was walking down the driveway to the corner of the building . . . I got out of the rear seat and got in the driver's seat . . . Then I heard two shots behind me . . . looked back to see what was happening and [the petitioner] was getting into the front passenger seat . . . I looked down and saw a gun in his hand . . . I asked [the petitioner] what was going on and he said "go, go, I shot that dude . . . ."'" In his trial testimony, he denied ever telling the police that

he saw the petitioner shoot [the victim]. Detective Kennelly testified, credibly, to the circumstance surrounding the taking of both statements.

"With respect to Michael Greene, he provided a statement on December 29, 2001, to Waterbury Police Sgt. Jannetty, also within hours of the murder, in which he said that at first he did not want to say anything about [the petitioner] shooting [the victim] 'because [the petitioner's] my cousin, and I didn't want to see him go to jail.' In the statement, Michael Greene gives the following account of what occurred: '[The victim] and Gregory kept arguing in the lobby . . . [the petitioner] also had some words with . . . [the victim] . . . he seemed to be sticking up for Gregory . . . [the victim] was saying he wanted to handle it all another day . . . [the petitioner] was saying "[Expletive] that, we ain't letten' this [expletive] ride" . . . We got in the Lexus . . . I looked in the backseat and saw the petitioner holding a gun . . . the gun he always carries . . . When we got up to the front of the diner by the ramp . . . [the victim] was saying something . . . Gregory jumped out of the driver's side to confront [the victim] . . . Me and [the petitioner] ran out of the Lexus and I grabbed Gregory from behind . . . [the petitioner] walked up to [the victim] from behind, said "[Expletive]," and held up the gun and shot him twice . . . [the victim] fell onto the ramp, and landed backwards on the side of the diner.' In his trial testimony, Michael Greene basically repudiates critical portions of his December 29, 2001 statement denying that he actually saw the petitioner shoot [the victim], and that he observed the petitioner with a gun. [Jannetty] testified, credibly, to the circumstance[s] surrounding the taking of both statements."

At the habeas trial, Cizik testified that he did not object to the substantive admission of the Greenes' statements because those statements undermined their credibility and "that could only be a good thing for the jury to see."

Bansley agreed with Cizik's strategic decision not to object to the admission of the statements of the Greenes, testifiying that "the more inconsistent statements that were presented in court, were more effective to the defense in showing that these individuals were untruthful and shouldn't be believed. I thought that was more important than objecting to it. I don't . . . personally . . . believe in objecting just because you can and just because you can win an objection. You've got to look beyond that and see whether the evidence actually hurts, and in this case I thought it was helpful because it impeached the credibility of the witnesses." Bansley further explained: "[W]hen I looked at the totality of the evidence and reviewed the transcripts, I thought it was more favorable that this evidence went in than not . . . [because] both of these individuals were present at the scene. Easily, you could have pointed fingers at

them, so they had a reason to lie. On top of that, they're talking about the police making threats. Frankly, I thought the combination of all that brought a fair amount of reasonable doubt."[1]

The habeas court held: "Attorney Cizik, as an experienced criminal trial lawyer, was well aware of the evidentiary law on the substantive use of inconsistent statements under *State* v. *Whelan*, [200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986)]. He was also well aware that *Whelan* was not a 'blanket rule' . . . and of the trial court's limited 'gate-keeping' function upon objection. [Cizik] testified, credibly, that he did not adhere to the concept of objecting for the sake of objecting, particularly where it appeared futile based on his assessment, and most especially when he believed the admission of the statements would benefit the defense by unveiling initial falsehoods and highlighting a [witness'] proclivity to fabricate. In the court's view, such was a prudential tactical determination on the part of counsel, and no evidence has been presented that, under these circumstances, the decision not to object rendered the representation, under the *Strickland* standard, 'outside the range of competence displayed by lawyers with ordinary training and skill in the criminal law,' nor has the petitioner shown the required prejudice." (Footnote omitted.)

On appeal, the petitioner claims that the habeas court erred in rejecting his claim that Bansley rendered ineffective assistance by failing to raise, in his first habeas action, the claim that Cizik's representation of him was deficient in failing to object to the statements at issue because that failure allowed "harmful evidence against [the petitioner to reach] the jury." We disagree.

As noted herein, our scrutiny of counsel's performance is highly deferential, and we must indulge a strong presumption that counsel's performance falls within a wide range of reasonable representation. See *Adkins* v. *Commissioner of Correction*, supra, 185 Conn. App. 151.

Both Cizik and Bansley testified that it is not necessary to object to the admission of evidence simply for the sake of objecting, and that the evidence at issue must be viewed within the context of the entire case. Cizik testified at the habeas trial that he did not object to the admission of the statements at issue because he considered the admission of those statements beneficial to the petitioner. Bansley agreed with Cizik's assessment that the inconsistency of those statements was beneficial to the petitioner in that they highlighted the lack of credibility of the two witnesses. Even if there was a likelihood that the trial court would have sustained an objection to the admission of the statements, we agree with the habeas court that Cizik's decision not to object to their admission was a reasonable strategic

decision based on his assessment that the statements were beneficial to the petitioner. We thus conclude that the habeas court properly determined that Bansley was not ineffective in failing to claim in the petitioner's first habeas corpus action that Cizik was ineffective in failing to object to the admission of the statements of Jason Greene and Michael Greene.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] Bansley also testified that the admission of the statements was irrelevant to the petitioner's defense at trial, which was that he was not even present when the victim was killed.